Please call the next case. 213-656, Independent Mechanical v. Jim Henrickson. Good morning, Your Honors. May it please the Court. My name is Dennis Lynch. I, along with Jack Cannon, represent the employee and appellant Jim Henrickson. In this case, the Circuit Court impermissibly substituted its judgment for the Commission and reversed the Commission's finding that the petitioner suffered a right-hand carpal tunnel during his employment with Independent Mechanical. The Commission's decision should be affirmed as it is not against the manifest weight of the evidence. The Commission's decision contains a detailed explanation of Henrickson's work prior to working for Independent Mechanical, his work at Independent Mechanical. It discusses and makes an explicit finding of persuasiveness as to Dr. Nagel's opinions and finds that those opinions are more persuasive than Dr. Carroll's opinions, the respondent's examiner. It is solely within the province of the Commission to choose between two conflicting medical opinions. That's what the Commission did in this case, and that decision is supported by the overwhelming weight of the evidence. That decision is also supported, included in that evidence, I should say, is Dr. Carroll's initial opinion that there was a causal connection between Mr. Henrickson's job duties in general and his carpal tunnel, as well as by the testimony of Mr. Henrickson's supervisor, Raymond Campbell. It seems to me the toughest thing that you have here is what did Clayman's doctor base his opinion on in regards to the type of plumbing work that Clayman was doing? Nagel, well, what did Nagel say based his opinion on? Sure, Nagel's pretty clear that his opinion is more based on history than it is on some of the finer details of Mr. Henrickson's job. Well, therein lies the problem, doesn't it? I mean, for 36 years, the Clayman worked as a construction plumber. His duties at the airport were a check plumber, right? He wasn't doing any real heavy work. Well, for 36 years, he worked as a construction plumber and was asymptomatic. There's no evidence in the record that he ever sought treatment, ever had any problems really at all, while working as a construction plumber. He began working for Independent Mechanical in May of 2005, roughly six months before the date of manifestation. Although he worked as a, quote, check plumber, that would also involve fixing various problems when they arise. I think what Justice Harris is raising, didn't Nagel, who you were citing for the causal connection opinion, expressly say his opinion was based upon the Clayman engaging in the work of a construction plumber throughout the day? I mean, didn't he base his opinion on the work of a construction plumber? No, Your Honor. He was given a job description as a construction plumber to look at and said that those activities would support a carpal tunnel. But he was also testified that he based it more, his testimony was that his opinion was based more on the history than it was on any of the finer details of what work he was performing. Did Dr. Nagel testify he would have, he would have a difficult time finding a causal connection if in November 2005 Clayman had not been performing work that required heavy, repetitive grasping? Yes. That's not what he was doing, was it? But it was, Your Honor. Based on the testimony of both Mr. Hendrickson and of his supervisor, Mr. Campbell, he was, some of the tasks he had to perform did involve heavy, repetitive grasping. At the airport? At the airport. At Independent Mechanical. They talked about using a closet auger. They talked about a drill that would have to be used to remove cloggage. Both Mr. Hendrickson and Mr. Campbell described those details. I mean, really, the testimony, the dispute was kind of what the quantum of those activities were and how often they would be performed. Well, was he a check plumber or was he a construction plumber at the airport? Are you saying he was both? No, Your Honor. I'm saying he was a plumber, and we have the daily activity sheets. We know he was a plumber. We know he was a plumber. At some time he was just performing check plumbing, and if there was no problem there was nothing for him to do. But when there were blockages, when there were other problems that he had to fix, it required heavy, repetitive grasping. It required the use of force. Sometimes during the course of his employment here he was operating essentially as a construction plumber, not simply as a check plumber. Is that what you're saying? I don't know that it would necessarily be as a construction plumber, but, yes, he was certainly performing more heavy-duty activities. How detailed were these daily activity sheets? I mean, can we go back, the commission look at what was noted to determine this was a task that required repetitive, heavy grasping or not? The commission discussed, indicated in its decision that it relied on his job duties at Independent Mechanical, both Mr. Henrickson and Mr. Campbell testified as to those specific duties and which ones would involve heavy, repetitive grasping. And really I think Mr. Campbell's testimony in some ways is the most persuasive because he concedes that the machines couldn't do all the work and there would be force involved in performing these activities. But the daily activity sheets, I'm sorry, I didn't mean to interrupt there, but were they so specific that it would itemize the tasks that were done that day or was it just a more general description of what the day consisted of, check bathrooms? Would it get into, you know, the fellow had to perform this particular task? It would. They would be broken down roughly by the hour and it would say either check plumbing or use the auger, use a K-50, perform different activities that would require more detail. And it's those specific activities that are mentioned in the activity sheets that both Mr. Henrickson and Mr. Campbell testified to at the arbitration. So can you tell us here today just how frequently the claimant would engage in this type of heavy, this condition? In looking through it and what we have, we don't have any of the activity sheets from May until August. From August until when he ends up going to the ER in November of 2005, it appears though at least almost every day he was performing some activity during that day that would require the forceful repetitive grasping. One time a day? It could be at least one time a day. Sometimes it was more frequent. It would just depend on the day. I mean, it's maintenance of bathrooms at O'Hare. Sometimes there were blockages that needed to be cleaned out. Sometimes there were, you know, maintenance problems that had to be repaired and sometimes there weren't. Who is Dr. Carroll? Dr. Carroll is an independent mechanicals examining physician, section 12 examiner. And he opined his opinion based on the claimant working as a check plumber, correct? He opined based on his opinion of his claimant as a check plumber, which he indicated that his understanding of the job duties were verbally relayed to him by counsel for independent mechanical. His opinion was that the work condition either caused or aggravated the carpal tunnel, right? He gave an opposite opinion to that of your doctor. Well, his initial opinion was that the job activities in general contributed to the carpal tunnel. His opinion at the deposition was to the contrary, correct? The commission had before it both of the conflicting opinions. It was their responsibility to resolve that conflict, and they did so. I think that's his general rule, and I don't disagree with that. But let me ask you a very specific point of question I think puts us into focus. You've got Nagel's opinion for you, Carroll on the other side. If Nagel's opinion is based on a flawed premise that he was working as a construction plumber and he was not, he was a check plumber, and Carroll's opinion is based on the correct understanding of the job duties, why would that not be against the manifest way of the evidence? Well, because I think that, number one, Dr. Nagel's opinion was primarily based on history, and in particular that once Mr. Hendrickson's partner was transferred away, there was an increase in the work, which was confirmed by Mr. Campbell, that the partner was transferred away. Number two, although Dr. Nagel was questioned about work as a construction plumber, he also testified as to what he understood from Mr. Hendrickson as to what happened at his work, that there was this increase in workload. You're right, but therein lies the issue. Didn't Nagel sort of qualify his opinion? Didn't he specifically state, and this is my interpretation, that it was based on his understanding of this heavy repetitive work? Well, I think his testimony was that there would have to be heavy repetitive work involved. If there wasn't, then what good would his opinion do? Well, but there was. It's just a question of what quantum of work there was. I mean, I don't think, I mean, even Mr. Campbell, the respondent's witness, confirmed that there was some heavy repetitive work. Basically, Mr. Campbell was of the opinion that that would have to take place over multiple hours of the day, and that's not, you know, that's not the law. When did Klingman start working for IMI? May of 2005. And it was November 1st, approximately, that his partner was transferred away. November 5th. November 5th. So there's no dispute that he was doing this heavy work for a period of months with IMI. Correct. And then he was transferred to what might be called a lighter duty job, am I correct? Well, no, pardon me, Your Honor. No, no, prior to May of 2005, he was doing, he'd worked for Great Lakes doing construction plumbing. Starting in May of 2005 is when he started working as a plumber for IMI and was doing check plumbing, but he had a partner from May until the beginning of November. So they would obviously divvy up the work. But they were doing check plumbing. They were doing check plumbing. So the real dispute is, is check plumbing an activity that can cause or aggravate this condition? Right. Right. What do you have to support that that is the case? Well, the description of the check plumbing that was done that Mr. Henriksen and Mr. Campbell provided, that some of those activities would involve forceful and heavy repetitive grasping. Do you think Campbell may be of the opinion it wasn't as heavy? Not so much that it wasn't as heavy, Your Honor, but that in Campbell's opinion he wasn't doing it often enough. And obviously that's not Mr. Campbell's role to say. You know, it's cited in the briefs that Edward Hines' case had a similar situation where the testimony was that maybe only 2% to 10% of the employee's day was spent performing the activities at issue. And really the question is not how repetitive you're doing it, but is that competent to cause the injury? Were the duties as the construction plumber, so to speak, ever quantified in the records? As a construction plumber or as a check? As a construction plumber. We know his basic job, you've acknowledged, was a check plumber. Right. His repetitive heavy thing only came into play at certain times. Right. So how much of his work on a daily basis was check versus construction? Well, I think it varied from day to day. But as I said, in my review of the activity sheets that were submitted by a respondent from August to November, at least at some point during the day he would have to auger a cloggage or use some sort of machinery, cut channel blocks. So maybe once a day he did it? I would say at a minimum once a day. But there were, you know, again, multiple, I mean, like any maintenance job, some days it might be five times a day and some days you might not have to do anything. Okay. A lot of good supports. Really, construction plumbing, what he did before he went with this employer, is fairly irrelevant, isn't it? Or did he have a condition at that time? Yeah. I mean, that certainly may have contributed to the development of a condition. But, you know, it's a preexisting condition that was asymptomatic. And it wasn't not only not until he started working for Indian Pet and Mechanical, but really when his partner got transferred away, that then he became symptomatic. And there's really no dispute as to that history. And who do you have to support Dr. Nagel saying that that was frequent enough activity in the job description that IMI is responsible? Correct? Right, that Dr. Nagel, and really the testimony of Henrickson and Campbell, even apart from Dr. Nagel's, I think is sufficient to support the award. I mean, there's no- Didn't Nagel testify? He really had absolutely no knowledge of what this man did while working for the employer. He did not know the finer details of what he was doing. It was based on his opinion on history. And didn't he say that his opinion as to causation would assume that the work of a construction plumber throughout the day would require heavy repetitive grasping? He testified that there would have to be some heavy repetitive grasping throughout the day. Not only at work as a construction plumber. I think- The question was, but your opinion today as to causation would assume that the work of a construction plumber throughout the day would require heavy repetitive grasping? The answer was yes. He was then asked, and so in reference to the claimant for your causation opinion, you would be assuming that up until you saw him in December of 2005 that he had been engaging in heavy repetitive grasping. The answer was yes. On cross-examination he was asked, so if the claimant during the period of November of 2005 was not performing work requiring heavy repetitive grasping without enough time to relax and recover, then would you change your causation opinion? The answer, yes. How would it change? I'd have a difficult time establishing a causal relationship. So now the question is, did he understand this man to be a construction plumber instead of a check plumber? Well, his testimony was primarily based on history. History given to him by the claimant. That he was asymptomatic and then symptomatic with these activities and when his partner was transferred away. And both the testimony of Mr. Henriksen and Mr. Campbell support that there were heavy repetitive activities. That's the problem. We're going to go back and forth all day, I see where this is going, because even though your doctor may know the same, well, you know, he's qualified in him doing some heavy repetitive lifting. You say, but aha, there's some evidence in the record that he did some, quote, unquote, repetitive lifting. Correct? Heavy lifting, right? So that's your answer here. Well, I think that's not. It has to be your answer, because I'm not a construction plumber. I don't think that's the full answer, Your Honor, because I think the commission in resolving the evidence isn't limited to choosing between Dr. Nagel and Dr. Carroll. And they explicitly say so in their opinion. They rely on the petitioner's testimony as to his activities. The commission relies on the petitioner's testimony as to his prior work duties as a construction plumber, his work duties as a check plumber, and the more persuasive opinions of Dr. Nagel. So I think even really taking Dr. Nagel out of the mix on history alone and on the testimony of Mr. Henderson and Mr. Campbell. History of working for who? History of being asymptomatic prior to working for IMI, independent mechanical. So is that history even relevant then? I don't think that it is relevant. I mean, I think it's relevant only so far as there's a preexisting. I mean, it's a preexisting condition. So you're saying that in the record here there is, earlier back, there is support for the commission's decision here. Absolutely. Nagel may be looking at, I mean, the questions are kind of remarkable, it seems to me. It was never written down. Yeah. But you're saying that if you examine this record, that Nagel says heavy work can cause this. You have a claimant saying, I engaged in this heavy work. And there's no dispute that there was a period of time that he did that. Correct. With your employer. So there is some evidence in the record to support the commission's decision. Do you need any more? No, I don't believe so. Okay. Unless there's any other questions. Thank you. Thank you. Good morning. Justice Oldridge. Counsel, may it please the Court, my name is John Berg and I represent the employer in regard to this matter. We ask that you affirm the decision of the Circuit Court of DuPage County. First issue, which I believe has been clouded. This claimant did not work as a construction plumber for independent mechanical at no time. That's the question we've been asking for the last 15 minutes. He never did. He never worked. He worked as a check plumber. Occasionally he would have to perform some maintenance. If you look at the DOT that was provided, Dr. Nagel, by claimant's counsel, other counsel, it is describing the duties of a construction plumber. The first testimony of the claimant during his testimony was about his duties working at Soldier Field, working for Naperville, with nothing to do with the only work that he did for independent mechanical, was working at O'Hare as a check plumber. He's hired as a check plumber. We know that. I don't think your opponent would dispute that. I don't think anybody disputes he was hired to work as a check plumber. What he seems to be saying is, okay, he was. But in the course of his duties as a, quote, unquote, check plumber, he occasionally performed activities that would fall under the definition of a construction heavy work plumber. What's your response to that? I completely disagree. He was not. If you look at his testimony, what he did at Soldier Field, he was constructing. He was building Soldier Field during the renovation. That is using cutters, hand tools, digging, laying pipe. He was not doing that. He was not constructing anything at O'Hare. He was performing some maintenance. And I specifically asked Dr. Nagle, went down the duties of a check plumber, would this contribute to carpal tunnel? No, no, no, no. You heard him referring to some activities that he said were more strenuous activities. What's your response to that? There are some. They're not repetitive. They're occasional. All the court and the commission should have done is look through the daily activity sheets. I asked the claimant, did you prepare these sheets? Yes. Is it in your handwriting? Yes. Going through these. So when it says check plumbing, what did you do? I pushed my cart. I walk into the bathroom. I put my hands underneath the sink. I don't even touch anything because it's automated with the infrared. I take my hand. I touch the towel rack, soap dish. I go into the urinal or the toilet and, again, push a button to check it. If the toilet was clogged, didn't he have to do something to unclog it? He would use an auger. He would plunge it. Dr. Nagle said that would not lead to carpal tunnel syndrome. He might occasionally and not repetitively use an auger. You know, I hate to have the court have to look through these, but this is what it is. This is November of 2000. Counsel, and I may have been inartful in my questioning of opposing counsel, but these daily activity sheets, are they so specific that you are able to identify from a review of those the amount or even occurrence of heavy repetitive grasping, or does it simply indicate the generic description of a checked plumber so that the commission could look at the daily activity sheets and even though Dr. Nagle may have been operating under a misapprehension as to what the actual title was of Kleiman, the record evidence would indicate that there was heavy repetitive grasping performed, and if so, at what frequency? Can we find that in the evidence? Well, you can find in the evidence that there really is no heavy repetitive grasping. The record is so clear as to what he did in his own writing, hour by hour, and it isn't like the majority of maybe 90%. It's check plumbing, check plumbing, check plumbing. I asked the Kleiman on cross-examination, did you prepare these sheets? These sheets clearly show that there is no repetitive heavy grasping. There is an occasional work using an auger that Ray Campbell testified that the machine does the work for him. You put the snake and the machine does the work. This is not construction. It is not heavy. It is actually an easy job. You walk around O'Hare and you check the plumbing to make sure that there's no leak. Is the standard in the terms of construction, and I don't want to parse words and put too fine a point on it, but you keep using the term repetitive and heavy. Is it either or, or is it supposed to be repetitive and heavy work? That is the standard provided by Dr. Nagle. Repetitive both of those things. He says heavy repetitive grasping. I mean, I don't know in which order. That's what we're working at. We're working with the opinion of Dr. Nagle. Dr. Nagle's opinion is based on, first, the history, which is not correct. First question from counsel as to causal connection is the DOT about construction plumbing. I sat in my chair and thought, I had to call my client at the break room. I don't know what's going on here. I didn't even know what they were talking about. And if you throw out the construction plumbing and you explain to Dr. Nagle what his duties were as a check plumbing, he said there's no causal connection. There is no causal connection statement here. It is not reasonable for the commission to find that. But it was a qualified. He's saying if there's repetitive heavy work, there would be a causal connection, but Nagle also candidly acknowledges if it wasn't heavy repetitive, then it wouldn't be a causal connection, right? Is that a fair assessment? Correct. And when I reviewed his actual duties, he said no, no, no. Look at the list during his testimony. The plaintiff's counsel asked him about his work that he did for Soldier Field in Naperville. These are two different jobs. Just because you put plumber after it, it's not the same. I think we're all clear on that. I mean, we all understand. He's got one employer who's a respondent's employer. What did he do for that employer? He had a preexisting condition. Was there aggravation or causation, you know, if it wasn't preexisting? And so we're looking at the activities he did as IMI. Let's leave this construction thing out. Correct. What is there in the record that shows a repetitive activity, and is there a medical causation opinion? I don't believe there is. And that's really your argument, isn't it? My argument is that there is no causal connection statement. There's no repetitive work, because by his own acknowledgment, occasionally a toilet might be clogged. But absent that, going into a bathroom to check and make sure the automatic towel dispenser is working and the soap dispenser is working, obviously is not remotely a heavy requirement. That's my point. That's why we're here. How often did he unclog a toilet if you want to construe that remotely to be heavy work? Well, I hate to disagree, but I'm relying on Dr. Nagle's opinion that that would not contribute to carpal tunnel syndrome. It's rarely. There's two activities. It's rarely. It's a clogged toilet, okay? You have the plunger, and Nagle's saying, oh, that doesn't cause any problems. Correct. He's crazy. That's probably the most repetitive part. It's his opinion that it has to be grasping and it has to be heavy. It isn't just – I'm not parsing. This is their doctor. This is not my examiner. This is their doctor. I understand that. That's the standard that he applied. But he's saying an auger is. Use of an auger. I'm not sure what he says about an auger. He didn't. Okay. But that is so rarely – the commission obviously did not review the evidence. That is as clear as a bell. These sheets, there are thousands of pages written by the hand of the claimant. It's all there. Check plumbing, check plumbing, check plumbing. I mean, I could do a Johnny Cochran and stand up here and read check plumbing, check plumbing, check plumbing, check plumbing, check plumbing. And during those times, his tendons were at rest. And that is the language of Dr. Nagel, not even Dr. Carroll. If his tendons are at rest, there's no causal connection. And the daily activity sheet, when it's parsing out the activity, is it by the hour? Sometimes even by the 15 minutes. It depends. All right. But it's as clear. I mean, this is a case of manifest weight. It's not rational. It's not reasonable for the commission to rely on the persuasive opinion of Dr. Nagel when he doesn't give a real causal connection statement. He's asked about work as a construction plumber. This is a red herring. I've been thinking about what is a red herring. Construction plumber is a red herring in this case where he never did it. He did some maintenance but never worked as a construction plumber as outlined by the DOT. The arbitrator's decision is clear. The 14-page decision of the Circuit Court of DuPage is clear. We ask that you affirm the decision of the Circuit Court. Thank you. Counsel may reply. Thank you, Your Honor. Your Honor. How do you get around that? If that's the way the evidence shakes out here, that those daily activity sheets in Clayman's own writing demonstrate on an hour-by-hour basis or even more frequently the lack of this heavy repetitive grasping, how do you get around that? Well, I think both the Edward Hines case and the City of Springfield case both talk to the quantum of the activities involved and that so long as they're – it doesn't have to be so repetitive or make up so much of your day so long as those activities are competent to cause the problem. Wouldn't you have to say that those activities are competent to cause the problem? Well, even Mr. Campbell's own testimony that was alluded to before, he was asked, and it starts at 247 in the record, talking about encountering a clod and requiring augering, he was questioned, it never requires of you from your hands or wrist forceful repetitive grasping? And the answer is no, that's not what I said. I said the majority of the time you can let the machine do the work, which is what it does. Question, so some of the time the machine can't always do all the work, correct? Some of the time you'd have to use forceful repetitive grasping. Answer, yeah, you'd have to grab the cable, correct. Would you be of contention if he was able to prove that he was forceful repetitive grasping at one time that there's evidence in this record enough to support the commission's decision? I think that so long as he's identified certain activities that he performed on any sort of regular basis that – There is no evidence in this record that he did anything with repetitive grasping on a regular basis. I think in reviewing the activity sheets that we have that he was doing those activities almost every day. Well, the opposing counsel says there's thousands of whatever, you know, entries. What percentage of the entries could you categorize as activities that have those characteristics?  I mean, I think there's, you know, as I said, there's some days where he may do augering activities multiple times a day. Even augering doesn't always require heavy repetitive grasping, only sometimes. I think augering does always require repetitive grasping. What, are you using a microclogger? If the logger doesn't stick, there's no repetitive grasping at all, the machine does the work. Well, but I think in getting into the clock, you're always going to have repetitive grasping involved. Have you ever used a logger? I have not. I have. It doesn't require it unless there's reach on elbow, and then you've got to push, or you reach a blockage, at which time then you've got to use some repetitive grasping. But the fact of the matter, augering itself does not. It's electrical, and that stage just goes in and it goes. Well, respectfully, Your Honor, Mr. Henrickson. Well, let me say, we're not making a decision on Justice Hoffman's use of an auger. If you could use Justice Aldridge's use, I think he's right. I'm asking, what are we going to find in those sheets? Well, the sheets will tell you. In terms of plunging. The sheets will tell you, plunging, or augering, or using a K-50, and all the activities, Mr. Henrickson described several activities from those sheets. Closet auger and slide rod, 1500 rotting, rotting and draining slop sinks, K-50 rotter, which is a pistol rod, using channel locks. He described that rotting and draining slop sinks were difficult because they were hard to access. He described in some detail all of those activities present on the daily activity sheets, what they would involve. Mr. Campbell, in large part, agreed with those descriptions, that those activities would involve. We've got that testimony, apparently unrebutted testimony, unless by record evidence the percentage of this check plumbing on the record, on the timesheet or whatever job description evidence, there's nothing in there about that, or what percentage of those activities are on those sheets. What do we have, or do we need to have anything medically to relate that activity? Well, I think Dr. Nagel's opinions, based on history from Mr. Henrickson, specifically, I think really the most important factor is one we haven't talked about much, that the history is clear that he lost his partner on November 1st, had to do more work, and that's when he noticed his symptoms. Isn't it, I mean, my reading of Nagel's opinion, I think a fair reading of that is, Nagel was under the impression this guy was a construction company. I don't think so, Your Honor. I think he was given a job description for a construction plumber, because I do think in repetitive trauma cases, in the construction trades, you see a situation where the last employer involved, if that's the date of manifestation, is kind of responsible for all of the work that's been done up to that point. And I think that's why Dr. Nagel was asked about construction plumbing. But Dr. Nagel's testimony is that his concern was on the history given to him by Mr. Henrickson, that he was asymptomatic, pardon me, lost his partner on November 1st, noticed an increase in symptoms at that time. And that's clearly his testimony, not based on construction plumbing. And both the Kishwaukee case and the Edward Hines case, again, held that the specificity of job details was an issue of weight for the commission to resolve. It doesn't somehow make that testimony incompetent or inadmissible or anything else. So Dr. Nagel's testimony is clear that based on the history given to him, he found a causal connection. Well, he did indicate that his causation opinion assumed both that the work of a construction plumber throughout the day would require heavy repetitive grasping, and that Kleiman did engage in that type of heavy repetitive grasping. I think those are two different questions. I mean, certainly as a construction plumber, they would be confident. But he testified so long as there was some heavy repetitive grasping, I don't think it necessarily has to flow from construction plumbing that a causal connection would be present. It's heavy repetitive grasping without time to relax and recover. Right. If he had time to relax and recover, it would have changed his opinion. Right. But I think, again, on this record, the mere undisputed evidence that he was asymptomatic before he began this work and before his partner was transferred away, and symptomatic once his partner was transferred away, is sufficient to sustain the causal connection. Thank you, Your Honors. We would ask that you reverse the circuit court and affirm the commission's finding. Thank you, Counsel Bowes. This matter will be taken under advisement for in this position.